SO ORDERED.

SIGNED this 01 day of March, 2013.

_____
Randy D. Doub
United States Bankruptcy Judge
_____

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NORTH CAROLINA
WILSON DIVISION

IN RE:

DERRICK MCCLENDON,                    CHAPTER 13
JANICE MCCLENDON,                     CASE NO. 10-04226-8-RDD

     DEBTORS

_____

DERRICK MCCLENDON,                    ADVERSARY PROCEEDING NO.
JANICE MCCLENDON,                     10-00305-8-RDD

     PLAINTIFFS

     v.

WALTER HOME MORTGAGE; JOYCE ANN
KELLER, Substitute Trustee; GREEN TREE
SERVICING, LLC; WALTER INVESTMENT
MANAGEMENT CORPORATION; WALTER
MORTGAGE COMPANY as Trustee for the
Mid-State Capital Trust 2010-1; and MID-
STATE CAPITAL TRUST 2010-1,

     DEFENDANTS

<u>ORDER AND OPINION</u>

     Pending before the Court is the adversary proceeding commenced by Derrick and Janice

McClendon ("Plaintiffs") on November 29, 2010. Walter Home Mortgage, et al. ("Defendants")

filed the Defendants' Motion for Summary Judgment on February 29, 2012. The Court conducted a hearing on the Motion on May 24, 2012. Per the Court's request, the parties submitted memoranda of law concerning the Motion. A second hearing on the matter took place on September 12, 2012. The Court entered an Order denying Defendants' Motion for Summary Judgment on November 2, 2012, and the adversary proceeding was set for trial. The trial was held over two days in Wilson, North Carolina, on January 15 and 16, 2013.

## JURISDICTION

Subject matter jurisdiction and jurisdiction over the parties exists pursuant to 28 U.S.C. §§ 151, 157, and 1334, and the General Order of Reference of the United States District Court for the Eastern District of North Carolina dated August 3, 1984. This matter is a core proceeding as set forth in 28 U.S.C. § 157(b)(2). Pursuant to the Pretrial Order entered January 7, 2013, the parties have consented to the bankruptcy court conducting all hearings in this matter and entering final judgment.

## BACKGROUND

Plaintiffs filed a voluntary petition for relief under Chapter 13 of the United States Bankruptcy Code on May 26, 2010. Plaintiffs executed a promissory note ("Note") in favor of Walter Mortgage Company ("WMC") on January 9, 2008. The Note is secured by a deed of trust encumbering Plaintiffs' residence at 3910 Central Heights Road, Goldsboro, North Carolina, 27534 referenced in Book 2589, Page 551 of the Wayne County Register of Deeds. The terms of the Note amortize the principal amount of $125,368.00 over 360 months at a fixed interest rate of 11.5% per annum resulting in a monthly payment of $1,241.51.

Prior to the events surrounding this matter, Plaintiffs resided in a mobile home located at Ginn's Mobile Home Park in Goldsboro, North Carolina. From January 2006 through June 2007,

Plaintiffs paid monthly rent totaling $300.00 per month. Plaintiffs' payment history was deemed "very good." Pls.' Ex. 13. While there, Plaintiffs became interested in owning their own home and soon started the process of seeking lenders who might finance a possible home purchase. During this process, Plaintiffs' loan applications for at least four different lenders were rejected for poor credit history and low monthly income. Plaintiffs continued seeking possible financing and came across an advertisement for a no-money-down home loan through Walter Mortgage Company ("WMC"). Upon meeting with WMC, the parties discussed possible options for building a home through Jim Walters Homes ("JWH") and financing the cost with a loan through WMC.[1] WMC gave Plaintiffs estimated loan amounts based on their combined monthly incomes, stated assets, and various liabilities. Early estimates for a monthly payment on a newly built home were around $950.00 per month. As discussions continued, estimated monthly payments increased, but Plaintiffs felt this was a manageable payment proposal and was still within their budgeted $900.00 to $1200.00 per month.

On June 13, 2007, Plaintiffs signed a Loan Pre-Qualifier Agreement with WMC for a loan totaling $119,840.00 at an annual interest rate of 9.25%. Pls.' Ex. 6. Plaintiffs also put a $250.00 down-payment on a parcel of real property on which JWH was to build the house. WMC's loan proposals included the balance owed on the real property. The monthly principal and interest payments were anticipated to be $985.90. This pre-qualification document also

---

[1] Walter Investment Management Corporation is the publically traded parent corporation of WMC, a residential mortgage servicing company. Jim Walter Homes, no longer in existence, was involved in building single family homes on property owned by its customers. WMC operated in part to finance customer home projects contracted through JWH.

outlined Plaintiffs' various assets and liabilities from which WMC would base its final loan agreement.[2]

The next step in the application involved the underwriting process itself. In his testimony presented by video deposition at trial, Gary Davis, underwriter for WMC, explained the procedures involved in qualifying customers for these sorts of home loans. He described the methodology for assessing a customer's financial situation to determine both loan qualification and interest rates associated with loans. Plaintiffs' first approved loan was based on their financial situation as outlined in two separate June 2007 Uniform Underwriting and Transmittal Summaries ("Summary") prepared by Mr. Davis. Pls.' Ex. 11, 20.

On the first Summary, dated June 15, 2007, Plaintiffs were granted pre-approval for a $119,840.00 loan at 10.25%, yielding a $1,073.89 monthly payment of principal and interest. The Summary listed Plaintiffs' total gross income at $3,841.67, consisting of Mrs. McClendon's gross wages and Mr. McClendon's "grossed-up" disability income.[3] Additionally, the first Summary included an estimate of monthly tax and hazard insurance payments, as well as another

---

[2] Per Gary Davis's testimony, underwriter for WMC, in approving Plaintiff's loan, WMC "did not verify [Plaintiffs'] assets." Davis Dep. 35:22. On the June 13, 2007, Loan Pre-Qualifier Agreement, moreover, the interviewer listed Plaintiffs' personal effects with a value of $35,000.00, which value Plaintiffs' deny ever representing to the interviewer.

[3] Mr. McClendon's disability statement from the Social Security Administration states that his full monthly benefit, before any deductions, totals $633.70. A monthly deduction of $93.50 for medical insurance is withheld, leaving a regular monthly Social Security payment of $540.20. According to Mr. Davis's testimony, his practice in the underwriting process is to "gross up" Social Security benefits by 25% because of their non-taxable nature. He testified:

> The regular monthly Social Security payment is the $540.00. That is used, but it's multiplied times 1.25 [sic], or what we refer to as "grossed up" because it's non-taxable income. So if you multiply that times—540 times 1.25—that gives you the 600-and-some-odd-dollars utilized on the underwriting and transmittal summary.

Davis Dep. 86:12–21.

$536.00 in monthly payments Plaintiffs already owed from automobile and student loans. The Summary also noted the primary borrower's credit score as 489 and stated that Plaintiffs owned $15,000.00 in verified assets. Both Plaintiffs testified they never acknowledged owning $15,000.00 in assets, and Mr. Davis admitted the assets were never verified. This data formed the basis of WMC's first loan proposal.

From the data compiled on the first Summary, various qualifying ratios were computed that figured into the underwriting procedure. These ratios included the Loan-to-Value ratio (LTV), Housing Expense-to-Income ratio, Total Debt-to-Income ratio (TDI), and Debt-to-Housing Gap ratio. The LTV and TDI figures were the most important ratios in identifying Plaintiffs' relationship to WMC's credit matrix.[4] The underwriter relied on this matrix to compute the loan's annual interest rate and, ultimately, to approve Plaintiffs for their home loan.[5]

---

[4] To clarify, the Total-Debt-to-Income (TDI) and Loan-to-Value (LTV) ratios are calculated as follows:

$$\text{TDI Ratio} = \frac{\text{Borrower's Primary Residence Cost} + \text{Other Existing Obligations}}{\text{Total Household Income}}$$

In the McClendon's final underwriting matrix, the TDI figure was calculated as follows:

$$= \frac{\$1,499.70 \text{ Total Housing Expenses} + \$200.00 \text{ Student Loan} + \$336.00 \text{ Car Loan}}{\$3,841.67 \text{ Total Income for Mr. and Mrs. McClendon}}$$

$$= 52.99\%$$

$$\text{LTV Ratio} = \frac{\text{Total Loan Amount}}{\text{Total Appraised Value of the Home}}$$

In the McClendon's final underwriting matrix, the LTV figure was calculated as follows:

$$= \frac{\$125,118.00}{\$128,230.00}$$

$$= 97.50\%$$

In Mr. Davis's testimony, he described the importance of the credit matrix in the underwriting process.[6] The matrix sets out parameters that must be met in order to qualify for a WMC loan. One of those qualifications is based on the applicant's TDI. The matrix sets a maximum allowed TDI at 50%. However, the matrix includes a catchall provision allowing underwriting flexibility. The provision states: "Exceptions may be made by underwriting personnel on a case-by-case basis, provided adequate compensating factors exist." Defs.' Ex. 14. In the first Summary, Plaintiffs' TDI was calculated at 48.40%. Their LTV ratio, however, was listed at 100%, outside the 97.5% maximum allowed by the underwriting matrix. The underwriter, therefore, had to rely on other adequate compensating factors per the catchall provision to pre-approve Plaintiffs' loan. In his assessment, Mrs. McClendon's lengthy job tenure with Wal-Mart, Mr. McClendon's "very, very stable" Social Security income, and their excellent rental payment history were all deemed adequate compensating factors in justifying an exception to the matrix's parameters. Davis Dep. 119:8. According to Mr. Davis, Plaintiffs would have been notified of their pre-qualified approval "the same day that this Summary was prepared." Davis Dep. 38:15.

The second Uniform Underwriting and Transmittal Summary, dated June 28, 2007, was prepared pursuant to WMC's "initial commitment" to offer Plaintiffs a home loan. The revision

---

The LTV ratio seems to have an inherent built-in flexibility to ensure its value does not exceed the 97.5% maximum. Per Mr. Davis's testimony, JWH would provide the appraisal value of the prospective home to WMC, and WMC would make the calculations accordingly. Mr. Davis was unable to account for the specifics of the appraisal numbers. Davis Dep. 41:12.

[5] On all Summary forms, the underwriter commented: "Transaction includes the purchase of a 1 acre parcel. Applicants have current rental history, mandatory escrows are required and ratios are acceptable. Applicant has over 9 years job tenure with a credit grade of B-3. Rate sheet dated 01/02/07. Commitment Issued 6/28/07, rate adjusted for high [LTV]." Pls.' Ex. 20.

[6] Mr. Davis testified that the matrix was developed by him, the company's president, and the president of the parent company, Walter Industries, by piecing together matrices of other lenders obtained through their various contacts. Davis Dep. 113:19–115:14.

provided Plaintiffs approval for a $117,090.00 loan at 11.5% interest, yielding a $1,159.53 monthly payment.[7] The changes in the second Summary were based on revised figures given to WMC by JHM regarding the estimated value of the finished property. Davis Dep. 39:16–40:15. Also, the second Summary was a finalized version of the first and included valuation estimates that put Plaintiffs within the allowable LTV range of 97.5%.[8] Mr. Davis indicated, however, Plaintiffs' new TDI figure was now outside the acceptable maximum (Plaintiffs' TDI was now at 50.63%), which required him to rely on the adequate compensating factors used in the first Summary. In sum, Plaintiffs were now approved for their loan according to the terms of the underwriting Summary completed on June 28, 2007.

Once the loan was approved, Plaintiffs soon discovered the house they selected for construction pursuant to their agreement with WMC and JWH was not in compliance with their neighborhood HOA requirements. In order to remedy the problem and be approved for construction, the house footprint had to be increased in size. Plaintiffs testified WMC told them not to worry about it since they could restructure the loan proposal to accommodate these

---

[7] To add to the complexity, on the same day, Plaintiffs were notified by WMC that they qualified for WMC's "High LTV Program." The notification provided Plaintiffs with two loan options: 1.) a loan in the amount of $108,106.00 at 10.25% interest and requiring a cash payment at closing of $11,734.00; and 2.) a loan in the amount of $117,090.00 at 11.5% interest and requiring a cash payment of $2,750.00 at closing. Plaintiffs signed the acknowledgement form. Pls.' Ex. 19. No indication as to which loan Plaintiffs chose is found on the document.

[8] The LTV ratio in Plaintiffs' loan was calculated using the total loan amount of $117,090.00 divided by the $120,090.00 appraised value of the finished home and lot. This resulted in an LTV of 97.5%. The "equity" inherent in the appraised value stems from Plaintiffs' own ten percent work done to the home after tender from Jim Walters Homes. To complete this ten percent, Plaintiffs, at their expense, were required to clear the lot of trees, clean up the remaining construction debris, complete the sewer line from the house to the street, rent backhoe equipment, purchase paint for and complete interior walls, and purchase and install home flooring.

mandated changes.[9] This required another Uniform Underwriting and Transmittal Summary, which, unsurprisingly, resulted in a higher loan principal and monthly payment. In this, the third and final Summary, dated September 6, 2007, the required loan amount was increased to $125,118.00 with an annual interest rate of 11.5%. This Summary was again based on the underwriting matrix used previously. In this Summary, Plaintiffs' TDI increased to 52.99%, and their LTV numbers were adjusted to ensure the maximum allowed ratio of 97.5%. As before, Mr. Davis was required to rely on adequate compensating factors for Plaintiffs to remain loan-eligible, as their TDI now stood well-above the 50% threshold. Finally, on January 9, 2008, Plaintiffs signed the Uniform Residential Loan Application for a loan of $125,368.00 at an annual interest rate of 11.5% with $2,702.00 due at closing.[10] Construction of the house ensued.

By April 2008 JWH was nearing completion of their 90% portion of the home construction, at which point they were to tender the home to Plaintiffs. The county inspector, however, refused to certify the home because of various building issues, including electrical problems and vapor barrier concerns. JWH returned to fix the problems but did not finish until late June 2008, after Plaintiffs' scheduled move-in date. Plaintiffs were unable to occupy the

---

[9] Mrs. McClendon testified that the first loan Summary—which allowed financing for the smaller, original home—approved a home that was the maximum size for which they qualified at the time. When the HOA issue arose requiring an increase in square footage, however, Mrs. McClendon testified JWH representatives told her, "Don't worry about it. Everything [is] okay." Subsequently, Mr. Davis's third and final Summary approved a loan for the larger home. Mrs. McClendon testified further:

> My concern was that the original house I wanted I was told I couldn't afford to get. I couldn't understand why, if I was at the border of my money, then why more money was being added onto [the loan], and I would have to pay more when they [originally] said I couldn't afford to get the house I wanted.

Trial R., Jan. 15, 2013, at 0:47:00.

[10] Again, Plaintiffs were required to pay attorney closing costs and complete ten percent of the home construction themselves.

home until early July, and they continued renting from Ginn's Mobile Home Park. This marked the beginning of Plaintiffs' financial problems with WMC. Plaintiffs' $1,241.51 monthly mortgage payments were scheduled to begin June 1, 2008. Despite the late tender and occupancy, Plaintiffs were unable to begin payments until July. They paid as they could starting July 16, 2008, and, by the time foreclosure proceedings on the home began in January 2010, Plaintiffs had paid in excess of $21,000.00 in principal, interest, and late fees. At trial, Plaintiffs contended WMC refused to work with them on their payment schedule in light of the problems that arose from JWH's late tender of the home. Additionally, Plaintiffs' daughter became ill in October 2009, which compounded Plaintiffs' financial difficulties with WMC. Plaintiffs contacted WMC by phone and wrote a letter explaining the situation. In early 2010, however, WMC returned to Plaintiffs all mortgage payments made in January 2010 totaling $3,000.00. In May 2010 Plaintiffs filed their bankruptcy petition to stay WMC's foreclosure.

On November 29, 2010, Plaintiffs filed this adversary proceeding objecting to WMC's proof of claim and alleging causes of action related to the origination of the loan evidenced by the Note. In the Complaint, Plaintiffs first object to Proof of Claim 12 in the amount of $137,068.05 filed by WMC. Plaintiffs allege the proof of claim "fails to adequately support why it should recover the amount of the secured claim based on its usurious rate spread home loan." Compl. at 9 ¶ 70. Second, Plaintiffs assert the mortgage held by WMC qualifies as a rate spread home loan with an unlawful interest rate of 11.5% in violation of N.C. Gen. Stat. §§ 24-1.1F (2008), -2, et seq. (2011). Third, Plaintiffs allege WMC's actions in originating the loan constituted unfair and deceptive trade practices in violation of N.C. Gen. Stat. § 75-1.1 and seek actual and statutory damages arising from any violations. Plaintiffs' fourth claim for relief stems from the unfair collection of a debt, alleging WMC's attempt to collect on a usurious rate spread

home loan debt in violation of N.C. Gen. Stat. § 24.1-1F (2008) violated the provisions of N.C. Gen. Stat. §§ 75-54, 75-55. Finally, Plaintiffs assert that they are entitled to reformation of the loan terms pursuant to N.C. Gen. Stat. § 24-2 and seek a declaratory judgment pursuant to N.C. Gen. Stat. § 1-254. Plaintiffs also seek reasonable attorney fees.

In the Answer to the Complaint, filed February 15, 2011, Defendants argue the loan does not violate § 24-1.1F and is not usurious because WMC acted reasonably and in good faith by following long-standing procedures when qualifying Plaintiffs for a loan as required by then enacted N.C. Gen. Stat. § 24-1.1F(c). In support of this argument, Defendants assert WMC verified and considered Plaintiffs' credit history, income, payment obligations, employment, and other financial resources when evaluating Plaintiffs' ability to obtain a loan. Furthermore, as evidenced by the testimony of Mr. Davis, Defendants state WMC used reasonable, commercially recognized underwriting standards in considering Plaintiffs' creditworthiness.

Defendants also argue that, because WMC did not act in violation of § 24-1.1F, WMC's proof of claim is valid and that Plaintiffs' objection to the claim should be denied. Likewise, because Plaintiffs' third claim for relief for unfair and deceptive trade practices is based on relief for violation of § 24-1.1F, it too should be denied. Defendants argue further the allegation of a violation of § 24-1.1F is insufficient to rise to the standard of an unfair and deceptive trade practice. As to the fourth claim for relief, violation of N.C. Gen. Stat. § 75-50, WMC argues there is no basis for relief because Plaintiffs' only contention is that WMC attempted to collect on a usurious debt. They assert Plaintiffs failed to allege facts supporting substantive violations of any part of Chapter 75. Finally, Defendants assert Plaintiffs' fifth claim for relief seeking declaratory relief should be denied because it is based on all other claims.

## DISCUSSION

**I.      Statute of Limitations**

Section 1-53 of the North Carolina General Statutes provides that an action for the penalty for usury, along with the forfeiture of all interest for usury, shall be commenced within two years from the date of the transaction. *Merritt v. Knox*, 94 N.C. App. 340, 342, 380 S.E. 2d 160, 162 (1989) (citing N.C. Gen. Stat. § 1-53(2)–(3)). Upon tolling of the limitations period, however, an otherwise untimely action may be revived under the doctrine of recoupment when brought defensively. The statute provides that "the right to enforce the obligation of a party to pay an instrument is subject to . . . [a] claim in recoupment of the obligor against the original payee of the instrument if the claim arose from the transaction that gave rise to the instrument." N.C. Gen. Stat. § 25-3-305(a). Indeed, because recoupment is in the nature of a defense arising out of the same transaction as a plaintiff's original claim, the defense "is never barred by the statute of limitations so long as the main action itself is timely." *Bull v. U.S.*, 295 U.S. 247, 262 (1935). *Berger v. City of North Miami, La.*, 820 F.Supp. 989 (E.D. Va. 1993), enumerates the requirements of recoupment further. The court said a proper claim of recoupment must: "(i) arise from the same transaction or occurrence as the main claim; (ii) seek relief of the same kind and nature as that sought by the main claim; and (iii) be defensive in nature and seek no affirmative relief." *Id.* at 992.

*Equal Employment Opportunity Commission v. First Nat. Bank of Jackson*, 614 F.2d. 1004 (5th Cir. 1980), illustrates the use of recoupment. In that instance, the Equal Employment Opportunity Commission filed a complaint against First National Bank of Jackson asserting a claim of discrimination. The bank counterclaimed on the theory of recoupment, asserting various torts otherwise barred by the Federal Tort Claims Act. The Fifth Circuit overruled the lower

11

court, disallowing altogether the bank's tort claims. In its ruling, the court emphasized the prerequisites for a proper claim in recoupment, which the bank failed to follow in asserting its tort claims.

> To state a claim in recoupment, a counterclaim must assert a claim arising out of the same transaction or occurrence which is the subject matter of the [original] suit and seek relief only to the extent of diminishing or defeating the [originally sought] recovery. A defendant's claim arising out of the same transaction or occurrence as that on which the plaintiff seeks recovery may be recouped, but there can be no recoupment if the damages claimed by the defendant arise from the breach of an independent contract or from an independent wrong unconnected with the plaintiff's cause of action. . . . Although the bank's counterclaim has some connection to the EEO''s suit, we deem that connection as being too tenuous and indirect to warrant the innovation of the doctrine of recoupment.

*Id.* at 1008 (internal citations and quotation marks omitted). In sum, recoupment allows for defensive claims to proceed only so long as they bear a close relationship to the original action.

These principles relate to the bankruptcy context as well. In bankruptcy law, proofs of claim serve a role similar to a plaintiff's original cause of action outside the bankruptcy context. Although procedurally offensive on its face, an adversary proceeding can serve as the proper context for recoupment when the primary objective is to defeat the basis of the original proof of claim. *See* Fed. R. Bankr. Proc. 3007.[11] *Salazar v. First Residential Mortg. Serv. Corp.*, No. 10-00101, 2011 WL 1237648, at *6 (Bankr. D. Md. Mar. 30, 2011), illustrates the principle. In *Salazar*, the court disallowed plaintiffs from seeking an affirmative claim for damages because such claim was outside the scope of the recoupment doctrine. However, the court permitted plaintiffs to plead violations of the Truth In Lending Act, otherwise barred by the statute of limitations, as a defense in recoupment with respect to the proof of claim filed in plaintiffs' respective bankruptcy case. The court cited Fed. Bankr. R. Proc. 3007(b) in support of its

---

[11] Fed. R. Bankr. P. 3007(b) provides: "A party in interest shall not include a demand for relief of a kind specified in Rule 7001 in an objection to the allowance of a claim, but may include the objection in an adversary proceeding."

conclusion. The rule "requires that if a demand for relief is sought in addition to the claim objection, the matter must be brought as an adversary proceeding." *Salazar*, 2011 WL 1237648, at *6. Thus, though a typical adversary proceeding is affirmative in nature, "[t]o deny Plaintiffs the defense of recoupment here would be to elevate form over substance." *Id*.

In the present case, the statute of limitations bars the forfeiture of all interest for usury and a penalty of twice the interest paid outside the limitations period, or prior to November 29, 2008. Hence, any affirmative relief based on time-barred claims will be denied Plaintiffs in the instant case. However, the doctrine of recoupment allows circumvention of the statute of limitations to the extent Plaintiffs' claim of usury is plead defensively since WMC timely submitted its proof of claim against Plaintiffs in their bankruptcy case.

The remaining causes of action set forth in the Complaint are controlled by a separate four year statute of limitations provided by N.C. Gen. Stat. § 75-16.2.[12] Because Plaintiffs executed the Note on January 9, 2008, and filed the Complaint on November 29, 2010, the remaining claims are not barred by the applicable statute of limitations and may proceed irrespective of the requirements of recoupment.

## II.    Violation of N.C. Gen. Stat. § 24-1.1F (2008)

Plaintiffs' first and second causes of action concern the law surrounding usurious rate spread home loans. They claim WMC's loan consummated on January 9, 2008, was an unlawful rate spread home loan under N.C. Gen. Stat. § 24-1.1F (2008). This forms the basis of their response to WMC's proof of claim filed in Plaintiffs' respective bankruptcy case. Plaintiffs seek

---

[12] Plaintiffs suggest a three (3) year statute of limitations applies to claims four and five pursuant to N.C. Gen. Stat. § 1-52(1) because the claims bring action "upon a contract, obligation or liability arising out of a contract, express or implied . . . ." N.C. Gen. Stat. § 1-52(1) (2011). However, when analyzed under either statute of limitations claims four and five are not barred.

damages for the violation of the rate spread home loan statute and also request WMC's proof of claim be denied in its entirety.

In North Carolina, the prima facie case for an action in usury consists of four elements: "(1) A loan forbearance of money; (2) an understanding that the money loaned shall be returned; (3) payment or an agreement to pay a greater rate of interest than that allowed by law; and (4) a corrupt intent to take more than the legal rate for the use of money loaned." *Hodge v. First Atl. Corp.*, 10 N.C. App. 632, 636–37, 179 S.E.2d 855, 858 (1971). It should be noted as well that in usury law, malicious intent on the part of a lender to collect an unlawful interest is not required to fulfill the fourth element. Indeed, "[t]he intent which is required is merely the intention to take the interest which is called for in the loan or forbearance agreement. In the event that the agreed upon interest exceeds that allowed by law under the particular circumstances of the case, the requisite usurious intention exists." *Western Auto Supply Co v. Vick*, 303 N.C. 30, 47, 277 S.E.2d 360, 371 (1981).

In the context of rate spread home loans, however, § 24-1.1F(c) provides that a lender's reasonable and good faith belief in a borrower's ability to repay becomes the foundation for a claim in usury. To establish liability in the rate spread home loan context, Plaintiffs must prove by preponderance of the evidence that the loan agreement 1.) qualifies as a rate spread home loan and 2.) violates the law concerning a lender's duty to the borrower in consummating such loan.

N.C. Gen. Stat. § 24-1.1F (2008), the version of the statute in effect at the time of the loan's execution, states in pertinent part:

(a) Definitions.—The following definitions apply for purposes of this section:
. . . .

(3) Home loan. A loan that has all of the following characteristics:

  a. The loan is not an equity line of credit as defined in G.S. 24-9(a)(2), a construction loan as defined in G.S. 24-10(c), or a reverse mortgage transaction.

  b. The borrower is a natural person.

  c. The debt is incurred by the borrower primarily for personal, family, or household purposes.

  d. The principal amount of the loan does not exceed the conforming loan size limit for a single-family dwelling as established from time to time by Fannie Mae.

  e. The loan is secured by . . . (iii) a mortgage or deed of trust on real property in the State upon which there is to be constructed using the loan proceeds a structure or structures designed principally for occupancy of from one to four families which, when completed, will be occupied by the borrower as the borrower's principal dwelling.

  f. A purpose of the loan is to . . . (ii) construct, repair, rehabilitate, remodel, or improve the dwelling or real property on which it is located, . . .

. . . .

 (7) Rate spread home loan.—A home loan in which all of the following apply:

  a. The difference between the annual percentage rate for the loan and the yield on U.S. Treasury securities having comparable periods of maturity is either equal to or greater than (i) 3 percentage points (3%), if the loan is secured by a first lien mortgage or deed of trust, . . .

  b. The difference between the annual percentage rate for the loan and the conventional mortgage rate is either equal to or greater than (i) 1.75 percentage points (1.75%), if the loan is secured by a first lien mortgage or deed of trust, . . .

. . . .

(c) No lender shall make a rate spread home loan unless the lender reasonably and in good faith believes at the time the loan is consummated that one or more of the obligors, when considered individually or collectively, has the ability to repay the loan according to its terms and to pay applicable real estate taxes and hazard insurance premiums. . . .

 (1) A lender's analysis of an obligor's ability to repay a rate spread home loan according to the loan terms and to pay related real estate taxes and insurance premiums shall be based on a consideration of the obligor's credit history, current and expected income, current obligations, employment status, and other financial resources other than the obligor's equity in the real property that secures repayment of the rate spread home loan.

15

(2) In determining an obligor's ability to repay a rate spread home loan, the lender shall take reasonable steps to verify the accuracy and completeness of information provided by or on behalf of the obligor using tax returns, payroll receipts, bank records, reasonable alternative methods, or reasonable third-party verification.

. . . .

(4) A lender's analysis of an obligor's ability to repay a rate spread loan may utilize reasonable commercially recognized underwriting standards and methodologies, including automated underwriting systems, provided the standards and methodologies comply with the provisions of this section.

(d) The making of a rate spread home loan which violates subsection . . . (c) of this section is hereby declared usurious in violation of the provisions of this Chapter. . . .

N.C. Gen. Stat. § 24-1.1F (2008).

The parties in the instant case have stipulated Plaintiffs' loan fulfills the requirements of a rate spread loan pursuant to the definitions outlined in § 24-1.1F(a). The issue before the Court, therefore, concerns § 24-1.1F(c) particularly and the duty of a lender to exercise a reasonable and good faith effort when consummating a loan with a prospective borrower. There is little case law concerning rate spread home loans or the duty lenders owe to borrowers in underwriting prospective loans. Defendant's duties are set out in the statute.

The language of N.C. Gen. Stat. § 24-1.1F(c) makes plain that a lender does in fact owe a duty of care to make reasonable inquiries into a borrower's ability to repay a loan, together with applicable taxes and insurance. A proper execution of this duty of care in the present context is, admittedly, very fact-specific. Requirements of a lender in executing his duty include making inquiries into a borrower's credit history, income, employment, existing debt obligations, and other financial resources available to the borrower. This conjunctive list in § 24-1.1F(c)(1) indicates that a lender, in executing its legal duty to a borrower, is required to make inquiries into all five categories of a borrower's financial status. Additionally, the disjunctive list of § 24-1.1F(c)(2) articulates various options the lender may use to "verify the completeness of

16

information" gathered from § 24-1.1F(c)(1). These include verifying a borrower's financial status by way of tax returns, payroll receipts, bank records, third parties, or any reasonable alternatives. Section 24-1.1F(c)(4) requires additionally that a lender use "reasonable commercially recognized underwriting standards and methodologies" to assess further a borrower's ability to repay.

Plaintiffs have proven by a preponderance of the evidence, and this court holds, that WMC did not adhere to the requirements of § 24-1.1F(c) when assessing Plaintiffs' creditworthiness. Nor did WMC put forth a good faith effort in ensuring Plaintiffs had the ability to repay the loan. Because WMC was without justifiable grounds for a reasonable and good faith belief that Plaintiffs could repay the home loan according to its terms, WMC violated the requirements of § 24-1.1F and is liable to Plaintiffs for damages. Moreover, Plaintiffs' agreement to the loan provisions throughout the underwriting process will not save WMC from a violation of their good faith duty to Plaintiffs.

In his testimony, Mr. Davis asserted that the underwriting process described above at length was the method by which WMC executed its good faith effort in approving Plaintiffs and assuring their ability to repay. The facts do not bear this out. WMC failed to properly investigate Plaintiffs' financial wherewithal in assessing their ability to repay the home loan as required by the state's rate spread home loan statute. The Court will assess each of the required elements of § 24-1.1F(c)(1) in turn.

**A. Income and Employment.** With respect to Plaintiffs' income, WMC failed to exercise the due care of a reasonable person in qualifying Plaintiffs for even the High LTV, high interest rate loan program. The income numbers used in the multiple Summaries vastly overstated Plaintiffs' reasonably anticipated monthly income and, correspondingly, their ability

to repay the loan. A review of the single paystub entered into evidence is telling. The "regular earning" period amount of $1461.54 is the only figure used to compute Mrs. McClendon's income for purposes of the underwriting Summaries. This figure yields a monthly gross income of $3,166.67.[13] The underwriting process, however, failed to take into account recurring withholdings by Mrs. McClendon's employer clearly indicated on her paystub. Federal and state income taxes, social security withholdings, and various other insurance and 401(k) deductions resulted in a total net pay of $807.63 per paycheck. None of these itemized deductions were factored into the drafting of the underwriting summaries. In fact, in light of the evidence presented at trial, they were ignored altogether. In the Court's view, a reasonable and good faith inquiry into Plaintiffs' ability to repay would have to require a consideration of all these recurring deductions, as they constitute nearly half of Mrs. McClendon's gross pay. Additionally, the "grossing up" of Mr. McClendon's disability payments by 25% adds to the unrealistic overview of Plaintiffs' financial situation.

Were the Court, for argument's sake, to grant that the income figures were reasonable estimates of Plaintiffs' monthly income, WMC would still have to answer for the glaringly subjective nature of the underwriting matrix itself. When analyzing the evidence concerning the matrix presented at trial, the adequate compensating factors render the ostensibly objective nature of the matrix virtually meaningless. Mr. Davis testified that these adequate compensating factors allow him "flexibility to be outside the box . . . on a kind of a file-by-file, cases-by-case basis." Davis Dep. 59:11–17. Plaintiffs, in both the second and final summaries, were deemed

---

[13] It is worth noting Mrs. McClendon's base pay in the two years leading up to the present loan application indicates an annual base salary (before taxes) totaling measurably less per pay period—$1,137.10 in 2006 and $1,093.91 in 2005. This adds to the Court's view that WMC failed in its duty of care.

outside the allowed Total Disposable Income (TDI) maximum of 50% even when using their gross income figures.

Instead of denying Plaintiffs' application based on these objective indicators, Mr. Davis used the subjective catchall provision of the WMC matrix, triggering the use of adequate compensating factors. He cited a number of them, which he felt justified approving Plaintiffs for a loan. These factors included Plaintiffs' rent payment history (which amounted to only $300.00 per month), income stability, and employment tenure. The Court simply disagrees that these factors were sufficient to compensate for Plaintiffs' exceedingly high TDI figures. Mr. Davis put forth little evidence to bolster his position. If Plaintiffs' anticipated payments on their home loan were $400.00 per month, their excellent rental payment history would be a reasonable indicator of their ability to make payments on the Note. However, the approval process required a payment over three times the amount Plaintiffs historically paid for housing. The Court is unwilling to accept WMC's reasoning regarding these adequate compensating factors. Mr. Davis's testimony leads the Court to believe the underwriting process simply ignored the negative aspects of Plaintiffs' financial ability while unreasonably relying on these compensating factors.

**B. Current Obligations.** In addition to the income and employment factors, the Court believes Plaintiffs' already-existing debt obligations further weigh against the reliability of WMC's underwriting process in assessing the likelihood Plaintiffs could repay their loan. Plaintiffs had two existing monthly debt obligations: a car payment of $330.00 and a student loan payment of $200.00. This additional $530.00 was part of the TDI percentage, but was essentially ignored by Mr. Davis's evaluation of the adequate compensating factors. In the Court's estimation, if the true net monthly income Plaintiffs received from their various sources were

compared to the total anticipated debts in light of the prospective home loan, Plaintiffs' total monthly debt payments nearly equal their anticipated monthly income. How a mortgage lender concluded these numbers were a good faith representation of a borrower's ability to repay a loan is beyond the Court's grasp. This leaves almost nothing for Plaintiffs' remaining basic monthly expenses. Little or no analysis of Plaintiffs' net disposable income is per se unreasonable.

**C. Credit History.** The Court also strains to understand how WMC felt Plaintiffs' median credit score of 489 represented a justifiable level of credit to ensure repayment on a loan whose TDI ratio exceeded 50%. Mr. Davis asserted the credit report and loan history documents on which they relied were typical documents for mortgage underwriting industry-wide. While this may be true, Mr. Davis did little to explain how the data compiled on the credit history was sufficient to reflect Plaintiffs' ultimate ability to service the home loan in question. He also failed to explain how the matrix integrated the credit history into its calculations. The Court believes Plaintiffs' credit scores and credit history are vastly more objective indicators of Plaintiffs' ability to repay a loan than the paltry adequate compensating factors, which ultimately became the touchstone of WMC's approved loan.

**D. Other Financial Resources.** Finally, it is noteworthy that, in his testimony, Mr. Davis asserted Plaintiffs' stated assets were $15,000.00 as indicated on the Summaries. He stated further these numbers were never confirmed as part of the underwriting process. It is also curious that Plaintiffs' Loan Pre-Qualifier dated June 13, 2007, included $35,000.00 in personal effects. Plaintiffs' deny ever representing to WMC they owned personalty valued at such amount. These stated asset figures, admittedly unverified during the underwriting process, serve only to detract further from WMC's good faith duty. Defs.' Ex. 1, § VII.

Finally, the Court would also highlight the nature of the underwriting process in the instant case as evidence of WMC's irresponsible lending practice. WMC's first pre-loan authorization qualified Plaintiffs for a loan of $119,840.00 at an interest rate of 9.5%. Each subsequent stage in the underwriting process increased the amount for which Plaintiffs qualified. When the footprint issue arose pursuant to Plaintiffs' HOA requirements, WMC again increased Plaintiffs' loan amount, qualifying them for a larger home. It is unclear to the Court how WMC felt in good faith Plaintiffs could afford to service each increasingly more costly loan. Mrs. McClendon expressed it best in her own testimony concerning the final loan increase after the HOA issue:

> My concern was that the original house I wanted I was told I couldn't afford to get. I couldn't understand why, if I was at the border of my money, then why more money was being added onto [the loan], and I would have to pay more when they [originally] said I couldn't afford to get the house I wanted.

Trial R., Jan. 15, 2013, at 47:00. By this point, the protracted loan qualification process had drawn Plaintiffs in too far, and WMC seemed all too happy to accommodate.

In sum, WMC had a clear statutory mandate to reasonably assess Plaintiffs' ability to make good on their consummated home loan. This duty, the Court finds, WMC failed to execute. Plaintiffs, having proven their case by a preponderance of the evidence, are entitled to damages. An appropriate remedy in light of the governing statute of limitations and applicable recoupment doctrine is in order.

For damages, the penalty in North Carolina for loans deemed usurious is set forth in N.C. Gen. Stat. § 24-2. The statute reads in part:

> The taking, receiving, reserving or charging a greater rate of interest than permitted by this chapter or other applicable law, either before or after the interest may accrue, when knowingly done, *shall be a forfeiture of the entire interest which the note or other evidence of debt carries with it, or which has been agreed to be paid thereon.* And in case a greater rate of interest has been paid, the person or his legal representatives or corporation by whom it has been paid, *may recover*

> *back twice the amount of interest paid in an action in the nature of action for debt*. . . . If security has been given for an usurious loan and the debtor or other person having an interest in the security seeks relief against the enforcement of the security or seeks any other affirmative relief, the debtor or other person having an interest in the security shall not be required to pay or to offer to pay the principal plus legal interest as a condition to obtaining the relief sought but shall be entitled to the advantages provided in this section.

N.C. Gen. Stat. § 24-2 (emphasis added).

North Carolina case law enumerates the remedy further. First, a finding that a contract is deemed usurious does not invalidate the efficacy of the contract itself. Rather, as *Argo Air, Inc. v. Scott*, 18 N.C. App. 506, 512, 197 S.E.2d 256, 259-60 (1973), explains:

> Should the court determine that the transaction was usurious, the court will (1) eliminate the indebtedness of all interest [c]harged, (2) determine the amount of interest [p]aid, and (3) give plaintiff credit on the indebtedness for twice the amount of interest [p]aid. Plaintiff then will be indebted to the holder of the note for the balance remaining, and unless the balance is paid, the holder will be entitled to have the deed of trust foreclosed as provided therein.

*Argo* at 512, 197 S.E.2d at 259–60. The Court notes that because of the legislature's strong policy against the charging of usurious interest, the applicable statute must be "strictly construed," leaving the Court with little room to renegotiate a remedy. *Id.* at 511, 197 S.E.2d at 259 (citing *Dixon v. Osborne*, 204 N.C. 480, 168 S.E. 683 (1933)). Also, *Haanebrink v. Meyer*, 47 N.C. App. 646, 267 S.E.2d 598 (1980), underscores the settled policy that the "right of action to recover the penalty for usury paid accrues upon each payment of usurious interest giving rise to a separate cause of action to recover the penalty therefor, which action is barred by the statute of limitations at the expiration of two years from such payment." *Haanebrink* at 648, 267 S.E.2d at 599.

In the instant case, the Court finds Plaintiffs' Note was indeed usurious in its contracted rate of interest and is, therefore, an illegal contract as written. The applicable remedy as outlined in statute and case law is appropriate with respect to "a forfeiture of the entire interest which the

note . . . carries with it." N.C. Gen. Stat. § 24-2. Because Plaintiffs' posture with respect to the contract as written is defensive in nature, recoupment permits such remedy despite a tolling of the statute of limitations.

With respect to interest paid on the Note to date, Plaintiffs ask the Court to extend additional, affirmative relief in the form of a recovery of "twice the amount of interest paid." N.C. Gen. Stat. § 24-2. Because such demand is affirmative in character, recoupment does not revive monetary damages on claims of interest paid beyond the two year statute of limitations period. However, per *Haanebrink*, any interest payments made on the usurious loan on or after November 29, 2008, are within the limitations period and do not require recoupment to revive such claims for relief. According to Defs.' Ex. 24, Plaintiffs have paid $36,046.47 in total payments throughout the servicing of their loan with WMC. A portion of the total payments was escrowed for taxes and insurance. $1,332.15 of the total paid constitutes principal on the loan, leaving a total of $34,671.64 in interest paid to date. Additionally, three payments made on the loan fall outside the applicable limitations period and are time-barred from recovery in the present action. The remaining $32,269.14, however, constitutes unlawful interest paid on the loan and is an amount subject to the doubling provision of § 24-2. Doubling this interest yields $64,538.28, a sum which the Court will subtract from the total $124,035.85 of indebtedness outstanding as indicated on WMC's loan history document. The balance of $59,497.57 will constitute the principle left owing on the still legally binding Note. The principal will bear no interest for the remaining amortization period. Therefore, WMC will maintain its proof of claim against Plaintiffs in Plaintiffs' respective bankruptcy case, but the claim will be modified according to the provisions of this opinion.

23

### III.    Violation of N.C. Gen. Stat. § 75-1.1

Plaintiffs' third claim for relief arises under Article 1 of Chapter 75 dealing with unfair and deceptive trade practices. Plaintiffs cite North Carolina consumer protection law, which states that "[u]nfair methods of competition in or affecting commerce, are declared unlawful." N.C. Gen. Stat. § 75-1.1(a). The prima facie case for a claim pursuant to this statute is outlined in *Walker v. Fleetwood Homes of N.C., Inc.*, 362 N.C. 63, 653 S.E.2d 393 (2007), whereby a plaintiff must demonstrate: "(1) an unfair or deceptive act or practice, (2) in or affecting commerce, and (3) which proximately caused injury to plaintiffs." *Id.* at 71–72, 653 S.E.2d at 399 (quoting *Gray v. N.C. Ins. Underwriting Ass'n*, 352 N.C. 61, 68, 529 S.E.2d 676, 681 (2000)). In elaborating on the first element, a practice is unfair when it offends established public policy or when it is "immoral, unethical, oppressive, unscrupulous, or substantially injurious to customers." *Id.* (quoting *Marshall v. Miller*, 302 N.C. 539, 548, 372 S.E.2d 397, 403 (1981)). It should be noted that "a practice is deceptive if it has the capacity or tendency to deceive; proof of actual deception is not required." *Marshall* at 548, 372 S.E.2d at 403.

One such violation of Chapter 75 involves breach of contract claims. In *Boyd v. Drum*, 129 N.C. App. 586, 501 S.E.2d 91 (1998), the court explains:

> [I]t is well-recognized that actions for unfair or deceptive trade practices are distinct from actions for breach of contract. A mere breach of contract, even if intentional, is not sufficiently unfair or deceptive to sustain an action under N.C. Gen. Stat. § 75-1.1. Substantial aggravating circumstances attendant to the breach must be shown.

*Id.* at 593, 501 S.E.2d at 97 (internal citations and quotation marks omitted). In other words, merely finding oneself on the losing end of contract will not suffice. Establishing a violation of § 75-1.1, moreover, is not well-defined but is a "highly fact-specific inquiry." *South Atl. Ltd. P'ship of Tennessee, L.P. v. Riese*, 284 F.3d 518, 535 (4th Cir. 2002). *See also Shepard v. Bonita Vista Properties, L.P.*, 191 N.C. App. 614, 624, 664 S.E.2d 388, 395 (2008) (determining that

whether an act constitutes an unfair or deceptive trade practice "usually depends upon the facts of each case and the impact the practice has in the marketplace"). Indeed, facts leading to "unfair conduct" can be viewed as that "which a court of equity would consider unfair." One significant demonstration of unfair conduct in this context involves "a party engag[ing] in conduct manifesting an inequitable assertion of power or position." *Id.*

With respect to remedies, *Blankenship v. Town and Country Ford, Inc.*, 174 N.C. App. 764, 769–70, 622 S.E.2d 638, 642 (2005), states that "our Supreme Court has also held that in a case involving a statutory violation and an unfair and deceptive trade practice claim plaintiff faces an election of remedies for conduct based on the same conduct or transaction." A recovery based on a claim for usury under Chapter 24 and a trebled recovery based on a violation of Chapter 75 when addressing the same conduct is inappropriate under North Carolina case law. Therefore, a choice of remedies must be made.

In the instant case, the Court has found a clear violation of the state's usury laws and has entered the statutory remedy to redress the wrong. Thus, an additional remedy concerning the usury violation based in Chapter 75 would contravene the policy laid out in *Blankenship*. However, the Court finds WMC also violated Chapter 75 of the North Carolina statutes with respect to a separate and distinct harm from the violations committed in contravention of Chapter 24 usury law. Particularly, the Court believes WMC's continued refusal to postpone the due date for Plaintiffs' first payment on their permanent loan forms the basis for the additional violation. Because of JWH's late tender of the home for occupancy, WMC should have extended the due date accordingly. This unfair and deceptive trade practice fully meets the requirements established in *Walker*. The violation was (1) an unfair and deceptive act affecting commerce; (2) it related to business dealings between WMC and Plaintiffs; and (3) was the proximate cause of

injury to Plaintiffs. Moreover, the Court finds the actions of WMC constitute an "inequitable assertion of power" in their dealings with Plaintiffs as described in *Riese*. In viewing the entirety of WMC's business dealings with Plaintiffs, moreover, the Court believes these actions rise to the level of injurious conduct as required by case law and constitute sufficiently aggravating circumstances to justify a damage award.

The specific acts include WMC's repeated unwillingness to work with Plaintiffs regarding their first missed payment, which came due on June 1, 2008. The foundation for Plaintiffs' inability to pay on June 1 is wholly rooted in the late tender of the home by JWH, in the failed inspection based on JWH's own construction errors, and in WMC's refusal to adjust the payment schedule accordingly. These actions, as they emerge from the whole context of the business dealings with Plaintiffs, add to the severity of WMC's conduct. A review of the terms of the Note and Allonge illustrates the point.

The Allonge, which accompanies the Note and was signed by all parties, specifically indicates that "[t]he Construction Period is the time period from the date of this Allonge to the date that is one month prior to the date the first payment of principal and interest is due on the Note." Additionally, according to the Note, the payments were to begin June 1, 2008. Pursuant to this term of the Allonge, the construction period allotted for building of Plaintiffs' home ran from the date of the signing of the Note (January 9, 2008) until May 1, 2008, "one month prior to" the first scheduled payment. Hence, the completion date of the home was to fall within this window of time but no later than May 1, 2008.

The Note and Allonge contain no provisions to protect Plaintiffs in the event the home was completed after the first payment came due. Section 2 of the Allonge sets out remedies in the event of a late completion of the home. The provisions, however, only protect the lender.

Any protection of the borrower in the event of a breach come solely "[a]t the option of the Lender." Allonge § 2A. The failure of JHM to tender the home to Plaintiffs in a timely manner on the eve of their first payment was grounds for an extension of time to make the first mortgage payment. Plaintiffs were forced to continue renting from Ginn's Mobile Home Park for an additional month and a half as they awaited a passing inspection on JWH's work. Understandably, Plaintiffs were unable to pay both a mortgage payment and a rental payment during this time. Nor should they have been required to. WMC owed it to Plaintiffs to delay the first payment and should have provided such terms in the Allonge. Their continued refusal throughout the entire loan payment history to do so constitutes a blatant and willful violation of N.C. Gen. Stat. § 75-1.1.[14] The Court finds damages to be an appropriate remedy.

The facts established at trial describe the long and painful process of qualifying Plaintiffs for their home loan. Their relationship with WMC catalogues countless inequities, which the Court has described at length. A loan that originally qualified Plaintiffs for a maximum of $119,840.00 (to build the "Savannah" style home plan they were told was the largest model they could afford) morphed into a $125,368.00 loan at a usurious interest rate (to cover a home that was markedly larger than the original model). To make matters worse, the home failed its final building inspections and delayed tender to Plaintiffs for more than a month past its due date. At trial, WMC put forth no evidence concerning its response to the late tender. In fact, instead of working with Plaintiffs with respect to the timing of their first payment, WMC repeatedly demanded a June 1, 2008, start date. Plaintiffs, pushed to their financial and emotional limits, were behind on their payment schedule from the very day interest began to accrue. Plaintiffs

---

[14]In Plaintiffs' pleadings in this adversary proceeding, they cited §§ 75-50 et seq. as an alternative grounds for relief. The Court believes these violations of the consumer protection law are better addressed under § 75-1.1 than under §§ 75-50 et seq.

testified throughout trial how inequitable their dealings with WMC had been throughout the process, and WMC presented no testimony to the contrary. The lion's share of their evidence concerned the nature of the underwriting process, which, in the Court's view, violated state law. The facts indicate WMC used their bargaining power to take advantage of Plaintiffs. The totality of evidence surrounding the business relationship makes it difficult for the Court to see otherwise.

Section 75-16 establishes the remedy for violations of the state's consumer protection laws. The statute reads:

> If any person shall be injured . . . by reason of any act or thing done by any other person, firm or corporation in violation of the provisions of this Chapter, such person . . . so injured shall have a right of action on account of such injury done, and if damages are assessed in such case judgment shall be rendered in favor of the plaintiff and against the defendant for treble the amount fixed by the verdict.

N.C. Gen. Stat. § 75-16. In the Court's view and based on the testimony given at trial, the home was tendered to Plaintiffs in early July 2008 after the home finally passed its inspections. Despite contacting WMC for additional time to begin payments, Plaintiffs were told the firm June 1, 2008, payment date would stand. Based on the Court's calculations, this would delay their first payment date until August 1, 2008, a date the Court finds more sensible. Therefore, actual damages will be assessed in an amount equal to all payments made by Plaintiffs preceding the more reasonable August 1, 2008, start date. According to the loan history, Plaintiffs submitted a payment of $1,241.51 on July 16, 2008, yielding a total of $1,241.51 in actual damages. Trebling the actual damages yields an amount equaling $3,724.53. This total shall be paid to Plaintiffs in consideration for their loss.

The Court would highlight that the awarding of damages in this instance is not an invitation for debtors in bankruptcy actions to bring frivolous proceedings for violations of unfair

and deceptive trade practices under Chapter 75 of the North Carolina statutes. The facts in this case are particularly egregious and concern ongoing, unilateral decisions on the part of WMC to demand the June 1, 2008, mortgage payment before the home was ever tendered to Plaintiffs. Plaintiffs were in no way responsible for the failed home inspections, and WMC's treatment of the unpaid June 1 payment throughout the mortgage history constitutes a violation of Chapter 75. The Court will specifically limit judgment in these kinds of actions in the future to instances, like the current case, involving violations solely on the part of a creditor through no fault of the debtor.

## IV.    Attorney Fees and Costs per N.C. Gen. Stat. § 75-16.1

Plaintiffs' request for relief includes the payment of reasonable attorney fees and costs pursuant to N.C. Gen. Stat. § 75-16.1. (Compl. 12). Section 75-16.1 states in pertinent part:

> In any suit instituted by a person who alleges that the defendant violated G.S. 75-1.1, the presiding judge may, in his discretion, allow a reasonable attorney fee to the duly licensed attorney representing the prevailing party, such attorney fee to be taxed as part of the court costs and payable by the losing party, upon a finding by the presiding judge that:
>
> > (1)    The party charged with the violation has willfully engaged in the act or practice, and there was an unwarranted refusal by such party to fully resolve the matter which constitutes the basis of such suit; . . .

N.C. Gen. Stat. § 75-16.1.

One of the policy considerations involved in an award of attorney fees in the context of consumer protection violations is "to encourage private enforcement of Chapter 75." *United Laboratories, Inc. v. Kuykendall*, 335 N.C. 183, 192, 437 S.E.2d 374, 380 (1993). Unlike the trebling of damages for violations of § 75-1.1, the awarding of attorney fees "is in no way related to the need to deter or punish." *Id.* Thus, allowing a recovery for attorney fees is based on wholly different acts on the part of a defendant, namely, the failure to act to resolve the matter privately.

Allowing a plaintiff to recover treble damages in addition to attorney fees will, therefore, "not result in double redress for a single wrong." *Id.* at 194, 437 S.E.2d at 381.

Based on the present facts, the Court finds sufficient evidence to justify an award of reasonable attorney fees. At the outset of the loan payment process, Plaintiffs were committed to servicing their home loan. Upon late tender of the home on the part of the builders, however, WMC refused to rework the payment schedule that was in clear violation of the terms of the Note and Allonge. Plaintiffs tried to negotiate a solution with WMC on the late tender issue. They had "arguments back and forth from the very beginning" about the problem, but WMC did not budge. Throughout the months following Plaintiffs' move-in, "this initial payment issue kept coming up every month." Plaintiffs were told they were "continuously behind" despite repeated efforts to solve the problem and come to a resolution. Mr. McClendon testified this initial payment issue "trickled all the way down to where they saw us as being bad payers on our mortgage due to what they caused to happen." Through repeated phone calls and letters to WMC, Plaintiffs' efforts were met with no indication on the part of WMC that it was interested in resolving the matter. Mr. McClendon testified he sensed the WMC loan agreement was "set up to fail from the beginning." When foreclosure proceedings began in early 2010, Plaintiffs were forced to declare bankruptcy to forestall WMC's unrelenting collection efforts. The Court believes this unreasonable refusal to negotiate a solution throughout the months following tender of the home is sufficient to constitute "an unwarranted refusal . . . to fully resolve the matter."

Therefore, in light of WMC's refusal to work with Plaintiffs to resolve the payment issues surrounding their home loan, the Court believes an award of attorney fees is justified. According to the attorney fee affidavit submitted to this Court by Plaintiffs' counsel on February 5, 2013, $25,563.41 in attorney fees and costs were expended to litigate this proceeding. The

Court believes these fees are reasonable in light of the resulting litigation necessitated by WMC's actions. In addition to the treble damage award of $3,724.53 for WMC's violation of N.C. Gen. Stat. § 75-1.1, the Court orders WMC to pay a sum of $25,563.41 in the form of attorney fees.

**V.      Declaratory Relief and Reformation of the Note per N.C. Gen. Stat. § 1-254**

The mandatory relief due for usury violations is outlined in Chapter 24 of the North Carolina statutes. Its provisions are sufficient to dictate how the Court should rule with respect to the terms of the Note. Because the usury statute mandates elimination of all interest on the Note, and because Plaintiffs' claim for relief is saved by the doctrine of recoupment, N.C. Gen. Stat. § 1-254 is presently inapplicable.

<u>**CONCLUSION**</u>

Based on the above, the Clerk is directed to enter judgment against Defendants as follows:

1.) Defendants shall modify the Note and Deed of Trust encumbering Plaintiffs' residence at 3910 Central Heights Road, Goldsboro, North Carolina, to show a principal balance of $59,497.57 due and owing, with no interest, to be amortized over the remaining term of the Note;

2.) Plaintiffs shall recover, and judgment shall be entered against Defendants, in the amount of $3,724.53; and

3.) Attorney fees shall be awarded in the amount of $25,563.41 to Sharon Bey-Christopher, attorney at law for Legal Aid of North Carolina.

**SO ORDERED**

**END OF DOCUMENT**